## Lebus, et al. v. Stansifer, et al.

(Decided June 17, 1913.)

### Appeal from Kenton Circuit Court
### (Criminal Common Law and Equity Division).

1.  Corporations—Suit by Stockholder for Himself and Other Stockholders to Correct Management of—When May Be Prosecuted.— Ordinarily a stockholder may not sue upon behalf of himself and other stockholders to correct an evil in the management of a corporation until the managing board has been requested to take such action, and has refused, but where the managers or directors of the corporation bear such a relation to the matter as to show that they would not from the very nature of things listen to any request to institute an action to remedy it, a stockholder on behalf of himself and other stockholders, who are similarly situated, may proceed to prosecute the suit without making any such demand upon the managing authorities of the corporation.

2.  Corporations—Suit by Stockholder for Himself and Other Stockholders to Correct Management—When May be Permitted to Sue for Themselves and Others—Pleading.—Where a district board of a burley tobacco society was not conducting the affairs of the corporation in such manner as to satisfy numerous of its stockholders in the matter of carrying out the terms of a pooling contract, in an action by two of the stockholders of the society for relief from the alleged mismanagement, the allegation being that there are something like 40,000 poolers, who in all respects are similarly situated as appellants, it was not improper for the plaintiffs to be permitted to sue not only for themselves, but for all the poolers.

3.  Corporations—Section 551, Kentucky Statutes—Intent to Prevent. Incorporators from Getting Control Contrary to Wishes of Majority of Stockholders.—In enacting section 551 of the Kentucky Statutes, the Legislature had in view the idea of preventing the incorporators from getting initial control of corporations at the inception of their organization contrary to the wishes of a majority of the stockholders. Under the provisions of this section, it is not within the power of the incorporators to designate in the articles of incorporation an initial board of directors without any action upon the part of the stockholders.

4.  Corporations—Placing of Stockholder's Shares in Voting Trust Without His Consent—Right of One to Control His Own Prop-

erty.—It is well grounded in our fundamental law that there is no limitation upon one's right to control that which is his own, except such restrictions as might be imposed by law, and it would be such a limitation to hold that a stockholder's shares may without his consent be placed in a voting trust either by a charter provision or otherwise, and he deprived completely of their control, even upon the ground that it was for his own as well as for the general good.

5.  Estoppel—Ratification—Intent to Ratify Must Be Shown.—Before there can be an estoppel, or before one's acts will be deemed to have been a ratification, it is essential that he should be in full possession of all the facts about the transaction, and being in possession of such facts, his conduct with reference thereto must be such as to show an intention to ratify what was otherwise an unauthorized act upon his part, or that of his agent.

PENDLETON, BUSH & BUSH, R. C. SIMMONS, J. H. HAZELRIGG, ALLEN & DUNCAN and O'REAR & WILLIAMS for appellants.

J. L. VEST, WM. A. BYRNE and J. G. TOMLIN for appellees.

OPINION OF THE COURT BY JUDGE TURNER—Affirming.

The Legislature of this State in 1906 passed what is known as the "Pooling Act" wherein any number of persons were authorized to pool their crops for the purpose of obtaining a higher price therefor than they might receive by selling the same separately or individually. The validity of that act was upheld in an opinion by Judge Carroll on a motion to dissolve an injunction, all of the Judges of this court participating except one. (Owen County Burley Tobacco Society, &c. v. Brumback, 32 Rep., 916).

Following the passage of that act there was incorporated under the laws of this State, without capital stock, The Burley Tobacco Society, the purpose of which was to promote the interests of the growers of Burley tobacco, and to act as the agent of growers in handling and selling their tobacco, and to aid them in securing remunerative prices therefor. It was provided that the affairs of the corporation should be conducted by a Board of Directors consisting of one member from each county wherein Burley tobacco was grown.

The plan of organization adopted was that the growers of such Burley producing counties should meet at their respective voting places on a given date, and elect a member of the County Board of Control (a subsidiary corporation to the Burley Tobacco Society); and in turn the members of such County Board of Control should

thereafter meet at the county seat and elect a chairman of such board for said county, and a director for such county in The Burley Tobacco Society; but under a provision of the by-laws adopted by The Burley Tobacco Society, only such growers of tobacco as might have pooled their tobacco with it for that year were entitled to participate in the precinct meetings for the election of members of the County Board of Control and Directors.

Under this plan the pools of the 1906 and 1907 crops of Burley tobacco were had; but in the progress of managing these pools certain difficulties were encountered which necessitated in the opinion of the managers of The Burley Tobacco Society the organization of another and companion corporation which should have capital stock, and be clothed with authority to do certain other things in connection with The Burley Tobacco Society to successfully carry out the pool idea.

Accordingly the plan was conceived of organizing in 1909 a pool of Burley tobacco, and procuring each pooler to subscribe a certain per cent of the gross proceeds of the sale of his 1909 crop to the capital stock of such companion corporation to be thereafter incorporated, and to be called the Burley Tobacco Company. The pool of 1909 was organized and about 40,000 growers of Burley tobacco joined, and among other things the pooling contract provides this:

"The undersigned further subscribe for shares of the capital stock to the amount equal to 10 per cent of the gross sales of the tobacco hereby pledged in the Burley Tobacco Company, to be incorporated, and authorize the Burley Tobacco Society to pay for said stock out of the proceeds of said tobacco when sold."

Thereafter and on the 22nd of October, 1909, the Burley Tobacco & Insurance Company was incorporated, the articles of incorporation of which provided, among other things, that the said Company might issue policies of insurance on tobacco pooled with The Burley Tobacco Society; but after the adoption of the articles, upon advice that the Company could not do an insurance business without depositing certain funds with the state authorities, in December, 1909, amended articles incorporating the Burley Tobacco Company were filed eliminating the insurance feature.

Among other things, it is provided in the amended charter:

"That the shares of stock shall be issued to the several beneficial owners thereof and the power to vote said stock shall be vested in the individuals who constitute from time to time the District Board of the Burley Tobacco Society, who shall continue to act until their successors are elected and qualify."

The incorporators of the Burley Tobacco Company were the persons who at the time constituted the Board of Directors of the Burley Tobacco Society. It is further provided in the amended articles that the incorporators named therein shall act as Directors until the annual election in 1910, and until their successors are elected and qualify.

There was no pool of Burley tobacco either in the years 1910 or 1911, and consequently, there was no election of directors of the Burley Tobacco Company for those years; but in 1912 there was a pool of Burley tobacco, and consequently, as provided by its charter, in October, 1912, there was a stockholders' meeting of the Burley Tobacco Company, at which the persons composing the District Board of The Burley Tobacco Society assumed the right to vote, and did vote under the provisions of the charter of The Burley Tobacco Company above quoted, all the stock of the 40,000 poolers who had signed the 1909 pooling contract.

Immediately thereafter, and on the 7th day of October, 1912, appellees Stansifer and Hudson, for themselves and the other 40,000 growers of tobacco who had signed the 1909 pooling contract, instituted this action in the Kenton Circuit Court against the members of the District Board of The Burley Tobacco Society who were assuming to act as Directors of The Burley Tobacco Company, and The Burley Tobacco Society, setting up in substance the facts above related, and praying for various kinds of relief.

The defendants answered giving at length and in detail a history of the organization; and the lower court on the face of the pleadings, and after passing upon the demurrers by each party, entered a judgment to the effect that the appellants were not, and had never been legal directors of The Burley Tobacco Company, and that the provisions of the charter of The Burley Tobacco Company as amended relating to the method of electing and constituting the board of directors thereof was illegal and void, and in violation of the laws and constitution of this State; and appointed commissioners to hold an elec-

tion for directors of said company in the fall of 1913, at the time fixed in the charter. From that judgment this appeal is prosecuted.

Under this state of the record we are confronted with five questions:

(1)   Have appellees the right to sue on behalf of all the poolers in the 1909 pool?

(2)   Under our law can the incorporators of a corporation lawfully designate themselves as directors thereof?

(3)   Is the provision of the charter of The Burley Tobacco Company placing the power to vote the stock of the poolers in the hands of the Board of Directors of The Burley Tobacco Society in contravention of the law of this State?

(4)   Have the poolers by the provisions of the pooling contract, or in any manner, parted with their right to control and vote their own stock?

(5)   Are the poolers estopped to assail the provisions of the charter of The Burley Tobacco Company by reason of the proceedings at the meeting of the Board of The Burley Tobacco Society in 1909, and did the poolers acting through their representatives at that meeting ratify or approve the action of the Board of Directors in attempting to take from them the right to vote their own stock?

(1)   Ordinarily a stockholder may not sue upon behalf of himself and other stockholders to correct an evil in the management of a corporation until the managing board has been requested to take such action, and has refused (Morawitz, Section 239-241) ; but where the managers or directors of the corporation bear such a relation to the matter as to show that they would not from the very nature of things listen to any request to institute an action to remedy it, a stockholder on behalf of himself and the other stockholders, who are similarly situated, may proceed to prosecute the suit without making any such request or demand upon the managing authorities of the corporation. (Morawitz, Sec. 242, 10 Cyc., 978; Chilton v. Bell Co. C. & I. Imp. Co., 153 Ky., 775).

It would have been in this case the merest folly for the plaintiffs to have made a request of the Board of Directors that they should institute an action seeking to have it adjudged that they themselves were not the lawful directors of The Burley Tobacco Company, and that they were usurpers and acting without authority. From

the very nature of things, it would have been out of the question to expect them to institute such a proceeding, and it would have been more than useless to have requested them to do so.

The allegation being that there are something like 40,000 poolers of the 1909 crop who entered into the pooling contract of that year, and who are in all respects similarly situated with reference thereto, it was not improper for the plaintiffs in this case to be permitted to sue not only for themselves, but for all poolers. .

(2) It is provided in section seven of the amended articles of incorporation of The Burley Tobacco Company that:

"The affairs of this corporation shall be managed by a Board of Directors to consist of not less than ten nor more than one hundred members as may be prescribed by the by-laws. The incorporators hereof shall act as directors until the annual election in 1910, and until their successors are elected and qualify."

It is claimed for appellees that this provision is directly contrary to our statute directing how corporations may be organized and the initial steps which shall be taken. Section 551 of the Kentucky Statutes is a part of the general law dealing with corporations, and deals specifically with the manner of their organization. Among other things, it provides:

"All elections for directors shall be by ballot, and shall be held in this state; and, in the first instance, the directors shall be elected at a meeting held before the corporation is authorized to commence business."

Evidently the Legislature had in view when it enacted that section the idea of preventing the incorporators from getting the initial control of corporations at the inception of their organization contrary to the wishes of a majority of the stockholders. The language of that section is clear and unambiguous. It leaves nothing for interpretation.

This is not as counsel for appellants seem to think purely a moot question since the election in 1912; because, if the pretended election of the board of directors in the fall of 1912 was void then under the charter provision if that be valid, the original directors named in the charter would hold until their successors are elected and qualify, and they are still directors under the original designation, independent of the election of 1912. We have concluded that under the express provision of the

statute quoted, it is not within the power of the incorporators to designate in the articles of incorporation an initial board of directors without any action upon the part of the stockholders.

The other questions are so closely related to each other we will discuss them together.

It is the contention of the plaintiffs that the attempt to create in the articles of incorporation the voting pool or trust is contrary to the provisions of section 207 of our Constitution, and section 552 of the Kentucky Statutes; but in our view of the matter it is unnecessary to determine that question. The provision quoted was in law fraudulent and void for another and different reason. It was manifestly inserted by the incorporators, who were at the time the Directors of The Burley Tobacco Society, for the purpose at the very inception of the new corporation to wrest its control from the great mass of stockholders, and perpetuate that control in themselves. Independent of any constitutional or statutory provision, in the absence of the consent of such stockholders such a provision cannot be upheld. The right to control one's own property is inherent; and while the courts have upheld voting trusts and pooling arrangements by stockholders where they are made with full knowledge of all the conditions, and are designed to effectuate some common purpose for the common good and have been voluntarily entered into, we are aware of no instance where individual rights have been so far abridged as to hold that a stockholders' shares may without his consent be placed in such a trust, either by a charter provision or otherwise, and he deprived completely of their control, even upon the ground that it was for his own as well as for the general good. It is well grounded in our fundamental law that there is no limitation upon one's right to control that which is his own, except such restrictions as might be imposed by the law of the land. Any other rule would be subversive of that individual responsibility which is the key-note of all civilization and progress. To say that appellants may without the consent of the poolers have inserted in the articles of incorporation a clause taking from the poolers the right to control that which is theirs, and place its control absolutely in their own hands, would be to recognize a most unwarranted assumption of authority. There is no more sacred duty confided to the courts than the upholding of individual rights in property, and no considerations of temporary advantage

which it is thought might accrue to the growers generally, will justify them in departing from the well beaten paths so clearly defined in all English and American jurisprudence.

We are called upon in this case by appellants' counsel to pass upon what they assume to be the controlling question, viz.: Whether or not the voting rights in stocks may be separated from the beneficial ownership; the deeper question is whether one may be deprived of the control of his own without his consent upon the plea that it is for his own as well as the general good.

The wording of the pooling contract wherein each pooler agreed to subscribe to the capital stock of the proposed Burley Tobacco Company to the extent of 10 per cent of the gross sales of his pooled tobacco, can be construed to be nothing more than authority to The Burley Tobacco Society to pay for such stock out of the proceeds of such tobacco when sold. There is nothing in it which could be tortured into meaning, or from which it might be remotely inferred, that the pooler intended to in any way give up or relax his own control over the stock which he then agreed to buy; and the action of the Board of Directors of The Burley Tobacco Society thereafter in trying to take from them that right, was without semblance of authority, and upon its very face the most indefensible usurpation.

It is in effect pleaded by the defendants that in the fall of 1909 at a meeting of the District Board of The Burley Tobacco Society, and before the Burley Tobacco Company was incorporated, there was a full and deliberate discussion of said contemplated articles of incorporation, and that the same had been considered by the poolers throughout the entire Burley district, and that each of the poolers delivered their tobacco to The Burley Tobacco Company, and stored it with said company after said articles of incorporation were recorded in Fayette county and in the Secretary of State's office, and each of the poolers accepted from it warehouse receipts for their tobacco, and that by reason of this and other similar acts of recognition upon the part of the poolers, they have ratified the articles of incorporation and are estopped to deny them.

But there is no allegation in the answer that the plaintiffs or any of the poolers of 1909, other than the incorporators themselves, knew during all these transactions that there had been inserted in the articles of incorpora-

tion the provision by which the poolers had been deprived of the right to control their own stock in it.

Before there can be an estoppel, or before one's acts will be deemed to have been a ratification, it is essential that he should be in full possession of all the facts about the transaction, and being in possession of such facts, his conduct with reference thereto must be such as to show an intention upon his part to ratify what was otherwise an unauthorized act either upon his part, or that of his agent. (10 Cyc. 1079. Kenyon Realty Co. v. National Deposit Bank, 140 Ky., 133).

It is suggested in argument that unless this provision in the charter of The Burley Tobacco Company is upheld, and the right of the directors to vote the stock of the poolers sustained, this stock or enough of it to secure control may fall into the hands of the tobacco trust, or others unfriendly to the growers, and that the purposes of their organization will thus be defeated, and they will again be at the mercy of the trust.

This would be a legitimate and forceful argument to present to the growers themselves, and if they could be induced to *voluntarily* enter into some fair and equitable arrangement of this kind, it would doubtless be to their interest.

But the expediency of such an arrangement is not for the courts; they must pass upon the legality of things as they find them.

Assuming that these threatened dangers are not exaggerated, and that the interest of the growers would be conserved by maintaining the present status, the courts would not be justified in arbitrarily disregarding sacred individual rights even to further so worthy a cause.

Judgment affirmed.